UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

RONALD MORRIS,

                     Plaintiff,

       v.

NEW YORK CITY HEALTH and HOSPITAL
CORP.,

                    Defendant.

----------------------------------------------------------------

NOT FOR PUBLICATION

**MEMORANDUM & ORDER**
09-CV-5692 (MKB) (ST)

MARGO K. BRODIE, United States District Judge:

Plaintiff Ronald Morris, proceeding *pro se*, commenced the above-captioned action against his former employer Defendant New York City Health and Hospital Corporation, ("Hospital Corp."), asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*. ("ADEA"), and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. ("NYSHRL"). (Compl. Docket Entry No. 1.) Plaintiff filed an Amended Complaint on February 1, 2011, alleging (1) Title VII disparate treatment gender discrimination, (2) Title VII and ADEA age and national origin retaliation, and (3) Sexual harassment under Title VII. (Am. Compl., Docket Entry No. 32.) Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on June 1, 2017. (Def. Mot. for Summ. J. ("Def. Mot."), Docket Entry No. 103; Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No.103-2.) By order dated March 27, 2018,[1] the Court referred Defendant's motion to Magistrate Judge Steven Tiscione for a report and recommendation. (Order dated Mar. 27, 2018.)

---

[1] The case was reassigned to the undersigned on February 21, 2018.

By report and recommendation dated August 10, 2018 (the "R&R"), Judge Tiscione recommended that the Court grant in part and deny in part Defendant's motion for summary judgment. (R&R ¶ 26, Docket Entry No. 133.) Plaintiff filed objections to the R&R on August 20, 2018. (Pl. Obj. to R&R ("Pl. Obj."), Docket Entry No. 134.) Defendant filed objections to the R&R on September 7, 2018. (Def. Obj. to R&R ("Def. Obj."), Docket Entry No. 136). For the reasons set forth below, the Court adopts the R&R and grants in part and denies in part Defendant's motion for summary judgment.

## I. Background

The Court assumes familiarity with the underlying facts as detailed in the R&R and provides only a summary of the pertinent facts.

### a. Factual background

The following facts are undisputed unless otherwise noted. Plaintiff, who identifies "as a black male with a Jamaican national origin," began his provisional employment in May of 2007 as a dental assistant at Bellevue Hospital Pediatric Dental Clinic ("Bellevue"), a hospital operated by Defendant. (Defs. Statement of Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 1, Docket Entry No. 87.)[2] Plaintiff was one of eight dental assistants who worked in Bellevue's pediatric dental department under the direct supervision of Henry Gonzalez. (*Id.* ¶ 4.) Under supervision and guidance, Plaintiff aided and assisted dentists with various dental

---

[2] The following summary derives from Defendant's statement of undisputed facts filed on August 1, 2016. (Defendant Statement of Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 1, Docket Entry No. 87.) Plaintiff has not submitted a counter-statement. Accordingly, the Court relies on Defendant's statement only where the evidence in the record supports it, and not where any evidence contradicts it. *See, e.g.*, *Szewczyk v. City of New York*, 2018 WL 1583970, at *5 n.5 (E.D.N.Y. Mar. 31, 2018) (citing *inter alia*, *Hill v. Laird*, No. 06-CV-126, 2016 WL 3248332, at *4 (E.D.N.Y. 2016)), *appeal docketed*, No. 18-1333 (2d Cir. May 5, 2018).

procedures. (*Id*. ¶ 3.) Plaintiff was also responsible for setting up equipment and supplies, maintaining the condition of dental operating rooms, taking X-rays, and preparing patients for various dental procedures. (*Id*.) Plaintiff's employment was terminated in May of 2008. (*Id*. ¶ 1.)

### i. Allegations of inappropriate conduct by Dr. Larsen and Dr. Pollack

In January of 2008, Plaintiff was assigned to assist Dr. Charlie Larsen. (*Id*. ¶ 4.) Plaintiff alleges that he asked Larsen if he could help in getting Plaintiff's stepdaughter a job. (*Id*. ¶ 5.) According to Plaintiff, after Larsen met with his stepdaughter, Larsen invited him out for dinner and drinks on several occasions "with the offer to move [P]laintiff to a hospital close to his home." (*Id*.) Plaintiff declined Larsen's offers. (*Id*. ¶ 4.)

In April of 2008, Plaintiff was assigned to assist Dr. Douglas Pollack. (*Id*. ¶ 5.) Plaintiff alleges that Pollack made sexual overtures and advances towards him during this assignment. (*Id*.) When asked about Pollack's sexual overtures and advances, Plaintiff testified that he "think[s] at one stage [Pollack] tried to touch [him]." (Dep. of Ronald Morris ("Pl. Dep.") 87:24, annexed to Decl. of Maxwell Leighton ("Leighton Decl.") as Ex. B, Docket Entry No. 105-1.) Plaintiff was asked which part of his body Pollack touched and responded, "I think it was my groin." (Pl. Dep. 88:2–3.) Plaintiff also stated that Pollack tried to kiss him in the examination room. (Pl. Dep. 93:25.) When questioned about the number of times Pollack tried to kiss him, Plaintiff responded that Pollack tried to kiss him on "maybe about one occasion." (Pl. Dep. 93:19–21, 25.)

Plaintiff also testified that on one occasion, Pollack handed him a restaurant menu and told him to "go and make a reservation for both of us to go to dinner." (Def. 56.1. ¶¶ 5–6.) Plaintiff considered this interaction to be sexual in nature. (*Id* ¶ 6.)

In addition, Plaintiff testified that Pollack made comments that he considered "derogatory," such as, offering to pay for a dental course for Plaintiff in Hawaii and making a comment concerning "a chance to park a car." (*Id* ¶ 5.) Plaintiff did not understand Pollack's comment about parking a car, but understood it to be sexual in nature because "[p]arking something is when you want to get rid of it. You don't want use for it, you just park it, you put it aside, that's why." (*Id*.) Plaintiff did not report these incidents to Bellevue.

### ii. Plaintiff's termination

On May 9, 2008, Peter Catapano, the Director of Bellevue, sent an email to Matthew Driscoll in Human Resources requesting that Plaintiff "be relieved of his duties as soon as possible," because of his poor work performance, and complaints from staff members, including Larsen and Pollack (the "Catapano Email"). (*Id*. ¶¶ 7–9.) Catapano wrote that Plaintiff had not performed his duties in an acceptable manner and staff members at Bellevue had reported that they were afraid of Plaintiff because he followed them around the hospital, stared at them, and walked around with a "mean or angry look." (*Id*.) In addition, Catapano reported that on one occasion, Larsen ordered Plaintiff to "leave the [operating room] because he felt [Plaintiff] was incapable of assisting and was interfering with the treatment of a patient who was under general anesthesia." (*Id*. ¶ 7.) In addition, he wrote that Larsen had submitted a handwritten letter to him stating that he "believe[d] [Plaintiff] should be removed of all responsibilities at Bellevue Hospital." (*Id*. ¶ 9.) In the Catapano Email, Catapano also wrote that he received a report from Pollack that same morning, reporting that "[Plaintiff] was leaving the room too often when a patient [was] waiting, washing his hands repeatedly, saying inappropriate things in front of patients, and complained that [Plaintiff] was malodorous." (*Id*. ¶ 8.) Catapano noted that Pollack "requested another assistant to replace [Plaintiff]." (*Id*.) On that same day, Driscoll

issued a letter to Plaintiff terminating his provisional employment as a dental assistant at Bellevue.  (*Id*. ¶ 9.)

### iii.  Complaint filed with the NYSDHR and right to sue letter

On May 23, 2008, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging claims of discrimination and retaliation related to his employment at and discharge from Bellevue.  (*Id*. ¶ 10.)  On June 25, 2008, Bellevue responded to Plaintiff's complaint and identified Plaintiff's "poor work performance," and "inappropriate workplace behavior," as its reasons for Plaintiff's termination.  (*Id*.)  The NYSDHR completed its investigation of Plaintiff's allegations and determined that no probable cause existed to support Plaintiff's allegations, and accordingly, dismissed his complaint.  (*Id*.)

### b.  The R&R

Judge Tiscione recommended that the Court grant in part and deny in part Defendant's motion.  (*See generally* R&R.)

### i.  Title VII disparate treatment gender discrimination claim

Judge Tiscione recommended that the Court dismiss Plaintiff's Title VII disparate treatment gender discrimination claims because Plaintiff "failed to meet his burden of establishing a *prima facie* case of gender discrimination."  *(Id*. at 11.)  He found that Plaintiff did not sufficiently allege "that he suffered any adverse employment action or that the action occurred under conditions giving rise to an inference of gender discrimination."  (*Id*. at 8–11.)

### ii.  Title VII and ADEA age and national origin retaliation claims

Judge Tiscione recommended that the Court grant Defendant's motion as to Plaintiff's Title VII and ADEA retaliation claims because Plaintiff failed to establish any retaliation based on his age or his national origin.  (*Id*. at 11–14.)  Although finding that Plaintiff likely satisfies

the first three elements – participation in a protected activity, which Defendant knew of, and adverse employment action – Judge Tiscione found that Plaintiff failed to establish a causal connection between his protected activity and his termination.  (*Id*. at 12.)

### iii.    Title VII sexual harassment claims

Addressing Plaintiff's sexual harassment claims under Title VII, Judge Tiscione recommended that the Court grant Defendant's motion as to Larsen, but deny the motion as to Pollack.  He concluded that Plaintiff has not demonstrated a *prima facie* case under either *quid pro quo* or hostile work environment theories with respect to Larsen because there is no evidence that Larsen's invitations were sexual in nature or were directed at Plaintiff because of his gender. (*Id*. at 16.)   Judge Tiscione found, however, that Plaintiff has demonstrated a *prima facie* case under both theories with respect to Pollack.  (*Id*. at 14.)

He concluded that Plaintiff sufficiently established a *prima facie* case of sexual harassment under a *quid pro quo* theory because the allegations create a presumption that his termination resulted from his refusal of Pollack's advances.  (*Id*. at 18.)  He found that Plaintiff's allegations against Pollack were "patently sexual in nature, including physical touching," unwelcomed by Plaintiff, and "Pollack's alleged behavior constituted a 'tangible employment action' under Title VII." (*Id*. at 16.)  Judge Tiscione concluded that in view of (1) Plaintiff's assertions that after refusing Pollack's advances he became hostile towards him and began to fault his work, (2) the Catapano Email listing complaints from Pollack about Plaintiff's performance as a reason to fire Plaintiff, and (3) Plaintiff's termination less than a month after he refused Pollack's advancements, there is "a triable issue of fact about whether Pollack fabricated his complaints in order to punish Plaintiff for his refusal of Pollack's advances." (*Id*. at 17.)  As to whether Pollack's actions can be attributed to Defendant, Judge Tiscione also found "a triable

issue of fact" as to "[w]hether Pollack was a *de facto* decision maker or a supervisor 'who affects the conditions of employment.'" (*Id.*)

Judge Tiscione further concluded that Plaintiff sufficiently established a *prima facie* case of sexual harassment under a hostile work environment theory because his allegations create a presumption "that Pollack's alleged actions created a hostile work environment that can be imputed to" Defendant. (*Id.* at 22.) Judge Tiscione found that Plaintiff subjectively perceived Pollack's alleged behavior to be abusive because he described it as "unwelcome, unprofessional, inappropriate . . . insulting, and offensive." (*Id.* at 19.) He also found that a reasonable jury could conclude that the frequency of Pollack's alleged actions "and what Plaintiff perceived as fabricated complaints in response to Plaintiff's refusals . . . [was] high enough to be objectively abusive." (*Id.* at 19–20.) In addition, Judge Tiscione found that Plaintiff's "physical contact allegations alone may render [Pollack's] behavior sufficiently severe, physically threatening, or humiliating." (*Id.*) Viewing the evidence in the light most favorable to Plaintiff, he concluded that "a genuine factual dispute exists as to whether Pollack's conduct created an environment that was objective hostile or abusive." (*Id.* (citing *Burford v. McDonald's Corp.*, 321 F. Supp. 2d 358, 363 (D. Conn. 2004)).)

Judge Tiscione also found that "sufficient allegations have also been made for imputing the conduct that created the hostile work environment to [Defendant]." (*Id.* 21.) Judge Tiscione concluded that "a triable issue of fact exists as to whether Pollack was indirectly empowered by [Defendant] to terminate Plaintiff." (*Id.* at 21.) He found that Defendant could be liable under a theory of vicarious liability as to Plaintiff's hostile work environment sexual harassment claim because "it seems that Pollack had the power to request that Plaintiff be reassigned," which constitutes a tangible employment action. (*Id.* at 21.) In addition, Judge Tiscione found that

"assigning vicarious liability to [Defendant] is appropriate because a tangible employment decision was made." (*Id*. 22.)

### iv. Faragher/Ellerth Affirmative Defense

In addressing Defendant's affirmative defense to the sexual harassment claims, Judge Tiscione concluded that summary judgment was inappropriate because there are genuine issues of material fact as to whether Defendant can rely on the defense. (*Id*. at 26.) He found that "Plaintiff has raised material issues of fact as to the application of the [Faragher/Ellerth] affirmative defense" because he alleges "he was terminated as a consequence of his refusal of Pollack's sexual advances," which is a tangible employment action, and the affirmative defense is not available when a tangible employment action is taken as a consequence of harassment. (*Id*. at 25.) Judge Tiscione found that even assuming that there was no tangible employment action resulting from Pollack's alleged harassment, "Plaintiff's failure to take advantage of corrective opportunities may not have been 'unreasonable' in view of the fact that" the alleged behavior only began a month before his termination. (*Id*. 25.)

## II. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). The district court may adopt those portions of the recommended ruling to which no

timely objections have been made, provided no clear error is apparent from the face of the record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1 (E.D.N.Y. Nov. 24, 2015). The clear error standard also applies when a party makes only conclusory or general objections. *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016) (holding "general objection[s] [to be] insufficient to obtain *de novo* review by [a] district court" (citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file *specific* written objections to the [magistrate judge's] proposed findings and recommendations." (emphasis added)); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. May 18, 2018) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))).

## ii. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide

"whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Unopposed recommendations

No party objected to Judge's Tiscione's recommendation that the Court grant Defendant's motion for summary judgment as to Plaintiff's (1) Title VII disparate treatment gender discrimination claim, and (2) Title VII and ADEA retaliation claims based on age and national origin.  The Court has reviewed the unopposed portions of the R&R and, finding no clear error, the Court adopts those recommendations pursuant to 28 U.S.C. § 636(b)(1). Accordingly, the Court grants Defendant's motion and dismisses Plaintiff's Title VII disparate treatment gender discrimination claim, and Title VII and ADEA retaliation claims.

### c. Defendant's objections to the R&R

Defendant objects to Judge Tiscione's recommendation that the Court deny its motion for summary judgment as to Plaintiff's sexual harassment claim against Pollack.  (*See generally* Def. Obj.)  Defendant also objects to Judge Tiscione's recommendation that the Court deny its motion for summary judgment as to its Faragher/Ellerth affirmative defense.  (*Id*. at 19.)  Defendant argues that Judge Tiscione "misapprehends" the factual record by "amplify[ing] both the claimed conduct by Pollack as well as his assessed authority, influence or role over Plaintiff's employment and the decision-making process that led to Plaintiff's termination."  (*Id*. at 10.)

### d. Plaintiff's objections to the R&R

Construing Plaintiff's objections to "raise the strongest arguments they suggest," *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (citation omitted), the Court

understands Plaintiff to object to Judge Tiscione's recommendation that the Court grant

Defendant's motion as to Plaintiff's sexual harassment claim against Larsen.[3] (Pl. Obj. ¶ 1.)

### e. Title VII sexual harassment claims

Plaintiff argues that he has established a sexual harassment claim against Larsen. (*Id.*)

Defendant argues that as with Plaintiff's claim against Larsen, his sexual harassment claim

against Pollack also fails. (Def. Obj. ¶ 11.)

Sexual harassment claims can be pursued under two legal theories: (1) *quid pro quo*

sexual harassment, where an individual's tangible job benefits are directly premised on

submission to unwelcome sexual conduct, and (2) hostile work environment, where an individual

is subject to severe and pervasive discriminatory conduct altering his conditions of employment.

*See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) ("Although the terms

'quid pro quo' and 'hostile work environment' do not appear in the text of Title VII, they are

---

[3] Plaintiff also objects to Judge Tiscione's recommendation that the Court deny his request for a transcript of the Cynthia Jenkins deposition. (Pl. Obj. ¶ 2–3.) Plaintiff requested the transcript in a letter to Judge Tiscione on February 26, 2018. (Pl. Letter dated Feb. 26, 2018, Docket Entry No. 130.) Judge Tiscione explained that the Court has no authority to order the use of federal money for discovery expenses for a *pro se* plaintiff in a civil case and noted that the testimony was likely not relevant for purposes of the summary judgment motion. (R&R. 23 n.11.) He recommended that the Court deny Plaintiff's request for the deposition transcripts. (*Id.*) The Court adopts Judge Tiscione's recommendation as to this request, because as Judge Tiscione noted, the Court has no authority to order the use of federal money for discovery expenses of a *pro se* plaintiff in a civil case. (*Id.* (citing *Espinal v. Coughlin,* No. 98–CV–2579, 1999 WL 1063186, at *2 (S.D.N.Y. Nov. 23, 1999) ("There is no authority that requires the federal government to pay for the discovery expenses of a *pro se* plaintiff in a civil case . . . . The *in forma pauperis* statute, 28 U.S.C. § 1915, permits the waiver of prepayment of fees and costs for *in forma pauperis* litigants, but there is no provision in the statute for the payment by the government of the costs of deposition transcripts.").); *see also McCain v. Buffalo Wild Wings*, No. 11-CV-143, 2013 WL 6825098, at *1 (D. Vt. Dec. 23, 2013) (denying the plaintiff's motion to waive the fees for a court reporter);*Goode v. Faneuff,* No. 04-CV-1524, 2006 WL 2401593, at *1 (D. Conn. Aug. 18, 2006) ("Although plaintiff has been granted permission to file his action *in forma pauperis*, 28 U.S.C. § 1915 does not authorize payment or advancement of discovery expenses by the court.").

useful to distinguish between 'cases involving a threat which is carried out and offensive conduct in general.'" (quoting *Mormol v. Costco Wholesale Corp.,* 364 F.3d 54, 57 (2d Cir. 2004))); *see also Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 181–82 (E.D.N.Y. 2012) (noting that there is no reason to distinguish between *quid pro quo* and hostile work environment harassment under Title VII) (citing *Gregory v. Daly*, 243 F.3d 687, 698 (2d Cir. 2001)); *Richards v. N.Y.C. Dep't of Homeless Servs.,* No. 05-CV-5986, 2009 WL 700695, at *5 (E.D.N.Y. Mar. 15, 2009) (examining a plaintiff's claims of sexual discrimination under hostile work environment and *quid pro quo* theories of sexual harassment.); *Gonzalez v. Beth Israel Med. Ctr.,* 262 F. Supp. 2d 342, 349–50 (S.D.N.Y. 2003) (stating that since the enactment of Title VII in 1964, sex discrimination theories of *quid pro quo* and hostile work environment have become well-established). To the extent that the two theories of discrimination arise from a plaintiff's allegations, both theories may be considered in analyzing the same claim. *See Reid,* 876 F. Supp. 2d at 182 (considering the plaintiff's "claim of quid pro quo harassment as part of her claim that she was subject to a hostile work environment by virtue of [the defendant's] conduct").

Claims under both theories are subject to the burden-shifting framework set forth in *McDonnell Douglass Corporation v. Green*, 411 U.S. 792 (1973). *See Clarke v. Pacifica Found.*, No. 07-CV-4605, 2011 WL 4356085, at *8–9 (E.D.N.Y. Sept. 16, 2011). Under the framework "a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *see also Graziado v. Culinary Inst. of Am.*, 817

F.3d 415, 429 (2d Cir. 2016).  If the plaintiff meets this "minimal" burden, *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008), a "temporary presumption" of discrimination arises, and the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the challenged conduct, *Vega*, 801 F.3d at 84 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).  If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff to show that the defendant-employer's reason was pretext for the discrimination.  *Id.* at 83.

### i.    Quid pro quo harassment

"[T]o establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment."  *Karibian v. Columbia University*, 14 F.3d 773, 777 (2d Cir. 1994).  "It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for [such] a decision . . . ."  *Id.* at 778; *see also Leketty v. City of New York*, 637 F. App'x 659, 661 (2d Cir. 2016) ("A quid pro quo Title VII sex discrimination claim requires that the plaintiff [] establish that she was denied an economic benefit either because of gender or because a sexual advance was made by a supervisor and rejected by her." (internal quotation marks omitted) (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992))).

The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible employment action to the acceptance or rejection of sexual advances.  *Figueroa v. Johnson*, 648 F. App'x 130, 135 (2d Cir. 2016) (quoting *Karibian*, 14 F.3d at 778.)  "A tangible employment action usually constitutes a significant change in employment status, such as hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Schiano*, 445 F.3d at 604 (quoting *Mormol*, 364 F.3d at 57). "A tangible employment action in most cases inflicts direct economic harm." *Burlington Indus.*, *Inc. v. Ellerth*, 524 U.S. 742, 753 (1998). However, a plaintiff is not required to present evidence of actual economic loss. *See Karibian*, 14 F.3d at 778 (holding that a district court incorrectly ruled that a *quid pro quo* sexual harassment theory requires proof of actual, rather than threatened economic loss).

"[T]he law of *quid pro quo* sexual harassment requires that the alleged harasser [be] the supervisor who affects the conditions of employment." *Clarke,*2011 WL 4356085, at *10 (citing *Heskin v. Insite Advertising, Inc.*, No. 03-CV-2598, 2005 WL 407646, at *17 (S.D.N.Y. Feb. 22, 2005). Alternatively, "a *quid pro quo* claim of harassment can rest on an alleged harasser's authority to influence an adverse employment decision, if that influence is so significant that the harasser may be deemed the *de facto* decisionmaker." *Hernandez v. Jackson, Lewis, Schnitzler & Krupman*, 997 F. Supp. 412, 417 (S.D.N.Y. 1998); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 447 (2013) ("If an employer does attempt to confine decision making power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decision and will likely rely on other workers who actually interact with the affected employee.").

## ii. Hostile work environment

To establish a hostile work environment claim, a plaintiff must "show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (quoting

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)); *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). The Second Circuit has cautioned that:

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.

*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (alteration in original) (citation and internal quotation marks omitted). A court should consider the totality of the circumstances and factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (quoting *Littlejohn*, 795 F.3d at 320–21); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). In evaluating whether a plaintiff has established a hostile work environment claim, the court must consider facially neutral conduct that might "bolster a harassment claim" when the facially neutral conduct is by the same individual who engaged in "overt[]" discrimination. *See Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1, 3 (2d Cir. 2017) (citing *Kaytor*, 609 F.3d at 547–48) (remanding with instructions to the district court to consider facially neutral incidents of harassment in analyzing the plaintiff's hostile work environment claim).

"An employer may be held vicariously liable under Title VII when a supervisor creates a hostile work environment." *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) (citing

*Faragher v. Boca Raton,* 524 U.S. 775, 807 (1998)).  Courts are expected to apply common law principles of agency in determining whether to impute liability to an employer for the actions of an employee.  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1180 (2d Cir. 1996) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986).  Where an employer has empowered an employee to take tangible employment actions against the victim employee, the employer may be vicariously liable for the employee's unlawful harassment.  *Vance*, 570 U.S. at 447. Tangible employment actions can include "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision cause a significant change in benefits."  *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 114 (2d Cir. 2015) (quoting *Ellerth*, 524 U.S. at 761).  In many cases where an employer confines decision-making power to a small number of employees, "those individuals will have limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee. . ." under these circumstances "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendation it relies."  *Vance*, 570 U.S. at 447 (2013) (citing *Ellerth*, 524 U.S. at 762).

### iii.    Plaintiff's sexual harassment claim against Larsen

Plaintiff objects to Judge Tiscione's finding that Larsen's alleged conduct was not sexual in nature.  (Pl. Obj. ¶ 1.)  Plaintiff contends that Larsen did not invite him "to his house to have dinner as a friendly gesture," but rather, "to go out to dinner with him at a restaurant for a date." (*Id.*)  Plaintiff further contends that he "interpreted Dr. Larsen's invitations for dinner dates to be expressions of his sexual interest" in him because "as a gay man, [Larsen] asked me out for dinner dates because of my gender and sex."  (Pl. Obj. ¶¶ 1–2.)

"[U]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature," are some of the types of conduct that are actionable under Title VII. *See* the EEOC Guidelines on "Discrimination Because of Sex," 29 C.F.R. § 1604.11(a) (1985). "While the Guidelines are not controlling authority, they provide substantial assistance in this area of agency expertise." *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir. 1998) (citing *Meritor Sav. Bank,* 477 U.S. at 65 (quoting 29 C.F.R. 29 C.F.R. § 1604.11(a) (1985))). An invitation to dinner and drinks without any other evidence that suggests the invitations were sexual in nature or made due to a plaintiff's gender is insufficient to establish a *prima facie* case of *quid pro quo* sexual harassment. *See Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 480 (S.D.N.Y. 2008) ("[M]erely inviting a female colleague to socialize after work patently fails to rise to the level of sexual overture."), *aff'd*, 354 F. App'x 559 (2d Cir. 2009); *Gregg v. New York State Dep't of Taxation & Fin.,* No. 97-CV-1408, 1999 WL 225534, at *10–11 (S.D.N.Y. 1999) (denying summary judgment where supervisor made repeated invitations to meals, complimented victim's physical appearance, asked personal questions, and touched plaintiff on at least four occasions in an offensive manner.).

Plaintiff testified that while working with Larsen, he asked Larsen if he could help get his stepdaughter a job. (Pl. Dep. 112:24.) Larsen agreed to help and after meeting Plaintiff's stepdaughter, Plaintiff states, "that's when these things started." (Pl. Dep. 113:3–4.) Plaintiff testified that Larsen offered to get him a job closer to his home if he went out for drinks with him. (Pl. Dep. 113:8–12.) He declined Larsen's offers. (Pl. Dep. 111:11.) Plaintiff could not recall how many times Larsen invited him to drinks. (Pl. Dep. 113: 14–15.) Plaintiff perceived Larsen's invitation as sexual in nature because "[Larsen] is a doctor, and [Plaintiff] is an assistant, socially, [they] have nothing in common." (Pl. Dep. 111:3–5.) Plaintiff further

explains that he "interpreted Dr. Larsen's invitations for dinner dates to be expressions of his sexual interest" in him because "as a gay man, [Larsen] asked me out for dinner dates because of my gender and sex." (Pl. Obj. ¶¶ 1–2.)

This evidence is insufficient to establish a sexual harassment claim against Larsen under either a theory of *quid pro quo* or hostile work environment. Although Plaintiff "interpreted" his interactions with Larsen to be sexual, Plaintiff fails to point to any evidence supporting his interpretation of Larsen's conduct as implicitly sexual, other than his speculation that it was. (Pl. Obj. ¶ 2.) "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . ." *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995)). While Plaintiff may have felt or believed that because Larsen is a gay man, his invitations to Plaintiff were sexual in nature, without some evidence to support his feelings or his belief, Plaintiff cannot establish that Larsen was asking him out to dinner because of his gender or sex. Accordingly, Plaintiff fails to establish a *prima facie* case of sexual harassment under either theory.

### iv.  Plaintiff's sexual harassment claim against Pollack

Defendant objects to Judge Tiscione's recommendation as to Pollack, arguing that the R&R "flatly mischaracterizes" and "amplifies Plaintiff's factual contentions well beyond that to which he testified on oath." (Def. Obj. ¶ 13.) In response to Judge Tiscione's finding that Pollack's behavior was "patently sexual in nature," Defendant contends that the R&R exaggerates facts and includes statements from sources that are not included in the record. (*Id.*) For example, Defendant claims that the R&R mischaracterizes Plaintiff's deposition testimony regarding Pollack's alleged physical interaction with Plaintiff because in the deposition, Plaintiff

prefaced several of his statements with the phrase "I think." (*Id*.) Plaintiff testified that he thinks at one stage Pollack tried to touch him and that he thinks Pollack touched him in his groin. (Pl. Dep. ¶ 6.) Defendant argues that the R&R's restatement of this testimony as allegations "that Pollack touched him on the groin on several occasions" amplifies Plaintiff's allegations, and thus Judge Tiscione incorrectly recommended denial of Plaintiff's claims against Pollack. (Def. Obj. ¶ 13.) In addition, Defendant argues that the R&R "catalogs the conduct" of Pollack inaccurately and misstates the number of interactions between Plaintiff and Pollack and, as a result, the alleged conduct is insufficient to establish a hostile work environment claim. (Def. Obj. ¶¶ 12–14.) Defendant also argues that Plaintiff's allegations are based on "episodic" and "isolated" incidents that do not create an objectively severe or pervasive environment under Title VII. (Def. Obj. ¶ 14.)

Plaintiff testified that while he was working with Pollack, in April of 2008, Pollack made sexual overtures and advances towards him. (Pl. Dep. 85:11.) First, on one occasion, Pollack asked Plaintiff to dinner. (Pl. Dep. 111:24.) Pollack handed to Plaintiff a restaurant menu and suggested that he "go and make a reservation for both of [them] to go for dinner." (Pl. Dep. 85:13–16.) Plaintiff believed Pollack's request was sexual in nature because prior to that incident, Pollack had made "some derogatory comments," such as offering to pay Plaintiff to attend a dental course in Hawaii without providing Plaintiff any additional information. (Pl. Dep. 86:1–10.) Second, Plaintiff testified that he "think[s] at one stage [Pollack] tried to touch [him]." (Pl. Dep. 87:24.) In response to a question asking which part of his body Pollack touched, Plaintiff responded, "I think it was my groin." (Pl. Dep. 88:2–3.) Plaintiff stated that Pollack tried to kiss him in the examination room. (Pl. Dep. 93:25.) When questioned about the number of times Pollack tried to kiss him, Plaintiff responded that Pollack tried to kiss him on

"maybe about one occasion." (Pl. Dep. 93:19–21.) Third, Plaintiff testified to a statement by Pollack that "he just got a chance to park a car [] Sunday," (Pl. Dep. 88:12–13), Plaintiff believed it was sexual because "[p]arking something is when you want to get rid of it. You don't want use for it, you just park it, you put it aside, that[s] why," (Pl. Dep. 88:24–25, 89:1–2). Fourth, Pollack also "made several other comments," that were sexually suggestive but Plaintiff could not recall everything that Pollack said. (Pl. Dep. 89:24–25, 90:1–14.)

### 1. Plaintiff's *prima facie* case of *quid pro quo* sexual harassment

Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Pollack made sexual advances toward Plaintiff when he tried to kiss him on one occasion in the examination room, on another occasion tried to touch him in what Plaintiff believes to be his groin area, and invited him to make dinner reservations for them.[4] *See Gostanian v. Bendel*, No. 96-CV-1781, 1997 WL 214966 at *6 (S.D.N.Y. April 25, 1997) ("Sexual conduct encompasses sexual demands, sexual overtures, sexual harassment and prohibited conduct."); *see also Carrero v. N.Y.C. Housing Auth.,* 890 F.2d 569, 573 (2d Cir. 1989) (allegations that supervisor engaged in unwelcome touching and kissing were sufficient sexual advances under a theory of *quid pro quo*).

Moreover, drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could find that Plaintiff's termination one month after rejecting Pollack's sexual advances was, in part, because of Plaintiff's rejection. One month after Plaintiff rejected Pollack's sexual advances, Catapano emailed Driscoll the Catapano Email requesting Plaintiff's termination. (Def. 56.1 ¶

---

[4] As to the car parking comment and the offer to pay for dental school in Hawaii, the Court declines to consider them in its analysis. There is nothing sexual about the comment. In addition, while an offer by a supervisor to pay for dental school may suggest some level of interest by the supervisor in the employee, without more, the Court cannot infer that the interest was sexual in nature or that the offer was made because of Plaintiff's sex or gender.

7.)  The Catapano Email specified that "Pollack requested another assistant to replace [Plaintiff]."  (*Id.* ¶ 8.)  In addition to requesting Plaintiff's reassignment, Pollack complained that Plaintiff "was leaving the room too often when a patient [was] waiting, washing his hands repeatedly, saying inappropriate things in front of patients, . . . [and was] malodorous."  (Def. 56.1 ¶ 1.)  Based on this evidence, a reasonable jury could conclude that Pollack complained about Plaintiff's conduct and requested that he be replaced because of Plaintiff's rejection of his sexual advances.  *See Carrero*, 890 F.2d at 579 (affirming district court's determination that plaintiff established a sexual harassment claim under the *quid pro quo* theory where the plaintiff's refusal to submit to the supervisor's sexual demands and her complaints against him resulted in deficient training and demotion).

There is no question that Plaintiff suffered a tangible employment action when Bellevue terminated his employment the same day the Catapano Email was sent.  *See Culleton v. Honeywell Int'l, Inc.*, 257 F. Supp. 3d 333, 342 (E.D.N.Y. 2017) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (quoting *Ellerth*, 524 U.S. at 761)).

Further, a reasonable jury could also find that Pollack was a decision maker or a supervisor who had the power to affect Plaintiff's conditions of employment.  Pollack had a supervisory role at Bellevue and Plaintiff assisted him for a month.  The Catapano Email to Driscoll specified Pollack's complaints about Plaintiff's conduct and his request for Plaintiff's reassignment as part of the reason for the recommendation that Defendant terminate Plaintiff.  Although the Catalano Email includes several reasons for seeking Plaintiff's termination, including Plaintiff "not performing his duties in an acceptable manner," following dental

assistants around the hospital, "rais[ing] his voice whenever [Mr. Gonzalez]" tried to speak to him, and being "inappropriate with patients," (Def. 56.1 ¶ 7), a reasonable jury could also find that because Pollack's complaints were some of the reasons listed, and Plaintiff was immediately terminated, Pollack sufficiently qualifies as a decision maker or a supervisor who had the power to affect Plaintiff's conditions of employment. *See Hernandez v. Jackson, Lewis, Schnitzler & Krupman,* 997 F. Supp. 412, 417 (S.D.N.Y. 1998) (finding triable issue of fact regarding "whether [employee] enjoyed sufficient supervisory authority over [p]laintiff to establish a claim for *quid pro quo* sexual harassment" where the employee "at least enjoy[ed] some degree of supervisory authority over Plaintiff" and "gave her work assignments to do").

Defendant characterizes Plaintiff's testimony regarding Pollack's conduct as "uncertain" (Def. Obj. ¶ 13), based on Plaintiff's qualification when answering questions about where he was touched and the number of times Pollack tried to kiss him, indicating that he thought something to be the case rather than unequivocally stating that it was the case. Defendant, in effect, is inviting the Court to find Plaintiff's testimony incredible. However, it is the role of the jury, not the Court, to evaluate a party's credibility. *See Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). Whether Plaintiff's recall of the facts should be believed or rejected is a task for the jury.

Accordingly, a reasonable jury could find based on Plaintiff's sworn testimony that Pollack's conduct was sexual, Plaintiff's termination was, at least in part, due to his rejection of Pollack's advances, and could further find that Pollack was a de facto decision maker or supervisor sufficient to establish a *prima facie* case of *quid pro quo* sexual harassment against Defendant.

### 2. Plaintiff's *prima facie* case of hostile work environment sexual harassment

After assessing the totality the alleged conduct, the relevant factors, and the Second Circuit's caution against "setting the [hostile work environment] bar too high," *Terry*, 336 F.3d at 148, the Court finds that Plaintiff has established a *prima facie* case of sexual harassment claim under a hostile work environment theory.

Plaintiff contends that the following facts contributed toPollack's conduct creating a hostile work environment: (1) giving Plaintiff a menu and requesting that he make a dinner reservation for the two of them; (2) trying to touch Plaintiff's groin; (3) trying to kiss Plaintiff once in the examination room; (4) offering to pay for Plaintiff's dental courses; and (5) making a comment about parking to Plaintiff that Plaintiff understood to be sexual in nature.  (Def. 56.1 ¶¶ 6–7.)  As discussed above, by trying to kiss Plaintiff and trying to touch his groin, Plaintiff has sufficiently shown the sexual nature of Pollack's conduct.

In addition, based on Plaintiff's description of Pollack's behavior as "unwelcome," "inappropriate," "insulting," and "offensive," (Pl. Opp'n ¶ 4, Docket Entry No. 119), a reasonable jury could find that Pollack's conduct was subjectively hostile and abusive.  *See Bass v. World Wrestling Fed'n Entm't, Inc*., 129 F. Supp. 2d 491, 501 (E.D.N.Y. 2001) (finding that the plaintiff's description of defendants' conduct as "unwelcome, humiliating, and offensive," established a subjectively hostile or abusive work environment); *see also Batten v. Glob. Contact Servs., LLC*, No. 15-CV-2382, 2018 WL 3093968, at *5 (E.D.N.Y. June 22, 2018) (finding a subjectively hostile environment where plaintiff testified that she was upset and called her mother in tears after the alleged incident).

 Moreover, a reasonable person would find an unwelcome attempted kiss, an invitation to dinner, and attempted touching to the groin to be severe, physically threatening, and humiliating.

23

*See Carrero*, 890 F.2d at 578 (holding a supervisor's constant unwelcome attempts to touch and kiss the plaintiff sufficient to establish a hostile work environment); *see also Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 301 (S.D.N.Y. 2011) (finding "a reasonable jury could consider [a supervisor's] conduct sufficiently severe so as to alter the condition of employment," where a plaintiff alleged her supervisor grabbed her by the waist and rubbed his genitals against her for "some seconds."); *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229, 2009 WL 3151094, at *8 (E.D.N.Y. Sept. 29, 2009) (finding that a fact-finder could conclude that plaintiff's claim that her supervisor attempted to kiss her, made sexually harassing remarks, and invited her for drinks was "objectively severe or pervasive"); *Susko v. Macaroni Grill*, 142 F. Supp. 2d 333, 337–38 (E.D.N.Y. 2001) (finding that in light of the number of offensive gestures and the small time frame, plaintiff had established a material issue of fact regarding her hostile work environment claim where during the month of December her supervisor touched her in the refrigerator, attempted to kiss and hug her, squeezed her side, and patted her on the behind); *Wahlstrom v. Metro-North Commuter R. Co.*, 89 F. Supp. 2d 506, 511, 521 (S.D.N.Y. 2000) (single incident where co-worker approached plaintiff from behind, gave her a bear hug, made a grunting sound, and slapped her left buttock three times sufficient to defeat motion for summary judgment on hostile work environment claim because "physical contact between the parties was neither harmless nor accidental").

Defendant argues that Plaintiff's "uncertain" testimony regarding the one occasion Pollack "maybe" tried to kiss him, and the one occasion when Pollack "tried to touch" him on the groin, and the lack of "sexually insinuating comments," together with "a single invitation to dinner" and a "casual suggestion of a probable career in dentistry" are insufficient to establish a hostile work environment claim. (Def. Obj. ¶ 14.) In addition, likening Pollack's conduct to

Larsen's, Defendant argues that Judge Tiscione incorrectly refered to Pollack's comments as "sexually insinuating comments to Plaintiff," because "no comments of any such nature were anywhere testified to by [P]laintiff." (*Id*. ¶ 12.) Contrary to Defendant's claim that the conduct of Larsen and Pollack are essentially the same, unlike Larsen who invited Plaintiff to dinner and drinks, Pollack's attempts at kissing Plaintiff and touching Plaintiff's groin, is sexual.[5]

In light of the nature of Pollack's alleged conduct and Pollack's statements about Plaintiff in the Catapano Email, a reasonable jury could conclude that Pollack's conduct and statements specified in the Catapano Email were in response to Plaintiff's refusal to his unwanted advances and find Pollack's conduct sufficiently severe or pervasive to constitute a hostile work environment.

In addition, a reasonable jury could find Defendant vicarious liability for Pollack's alleged conduct. Defendant objects to Judge Tiscione's finding that because there are triable issues of fact as to whether Defendant empowered Pollack to take tangible actions against Plaintiff and Plaintiff was terminated, Defendant could be vicariously liable for Pollack's conduct. (R&R. 21–22.) In opposing this conclusion, Defendant argues that any role Pollack "played in an employment decision made by Dr. Catapano cannot be deemed at all meaningful," (Def. Obj. ¶ 20), because it "echoes the very substance of multiple complaints brought by Larsen (who had worked with Plaintiff longer), Gonzales (who had supervised Plaintiff throughout), and several dental assistants and hygienists throughout the facility. (*Id*. ¶ 18.)

---

[5] Defendant argues that Judge Tiscione misstates the number of interactions between Plaintiff and Pollack and that Plaintiff's allegations are insufficient to establish a hostile work environment claim. (Def. Obj. ¶ 14.) However, there is no threshold number of harassing incidents that give rise to a hostile work environment claim. *See Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (citing *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999)) (internal quotation marks omitted).

Pollack's status as a supervisor or a decision-maker, whose actions can be attributed to Defendant, is a triable issue of fact. Pollack was undoubtedly a supervisor to Plaintiff during the month of April when Plaintiff assisted Pollack in the exam room. (Def. 56.1 ¶ 5.) Pollack's request to have Plaintiff reassigned is a tangible action even though it is unclear if Plaintiff was reassigned before his termination. *See Equal Opportunity Emp't Comm'n v. United Health Programs of Am., Inc.*, 213 F.Supp.3d 377, 418 (E.D.N.Y. 2016) (finding "[a] factual dispute regarding whether [an employee] qualifies as a supervisor within the meaning of Title VII" where the employee had the authority to reassign claimant on behalf of defendant).

Although Pollack did not directly terminate Plaintiff, the facts create a presumption that Defendant "delegated [its] power to take tangible employment actions." In the Catapano Email, Catapano informs Driscoll that he received a complaint from Pollack that same morning. (Def. 56.1 ¶¶ 8.) A reasonable jury could find that, based on the temporal proximity of Pollack's complaint to Catapano, the Catapano Email to Driscoll, and Plaintiff's termination, Pollack's complaint was one of the reasons for Plaintiff's termination. Because material issues of fact exist as to Pollack's motive, a reasonable jury could find a discriminatory reason to be one of the motivating factors for Plaintiff's termination.

Defendant contends that Pollack did not play a "meaningful" role in Plaintiff's termination. (Def. Obj. ¶ 17.) However as discussed *supra*, Pollack's complaint about Plaintiff's conduct at work and his request to have Plaintiff reassigned were both included in the Catapano Email to Discroll requesting Plaintiff's termination. (Def. 56.1 ¶¶ 7–8.) The fact that the Catapano Email states other reasons for Plaintiff's termination is not determinative. It is enough for Plaintiff to demonstrate that a discriminatory reason was at least one of the motivating factors for his termination. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995); *see also Richardson-*

*Holness v. Alexander*, 196 F. Supp. 3d 364, 371 (E.D.N.Y. 2016) ("[E]mployment decisions that are made collectively can be tainted by the bias of a single biased individual so long as the biased party played a 'meaningful role' in the decision making process.")

There is sufficient evidence in the record from which a reasonable jury could find that Pollack was empowered by Defendant to take a tangible employment action against Plaintiff.

### 3. Defendant's non-discriminatory explanation for Plaintiff's termination

The Catapano Email recommending Plaintiff's termination lists numerous legitimate nondiscriminatory reasons for Plaintiff's termination, including his inappropriate behavior with patients and staff, interference with patient treatment, and poor work performance. (Stat. Facts ¶¶ 7–9.) The Catapano Email satisfies Defendant's burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Duffy v. State Farm Mut. Auto. Ins. Co.*, 927 F. Supp. 587, 594 (E.D.N.Y. 1996) (defendant articulated a legitimate, nondiscriminatory reason for plaintiff's termination after submitting "affidavits of numerous employees describing in detail plaintiff's unsatisfactory job performance and bad attitude."); *see also Yoselovsky v. Associated Press,* 917 F. Supp. 2d 262, 275 (S.D.N.Y.2013) (finding that the defendant met its burden by providing that the plaintiff's job performance "had, for many months, fallen well below his managers' expectations," and his "managers eventually determined that his performance had not improved to an acceptable level and made the decision to terminated him."); *Fair v. Guiding Eyes For The Blind, Inc.*, 742 F. Supp. 151, 156–57 (S.D.N.Y. 1990) (defendant's burden of articulating a legitimate, nondiscriminatory reason for plaintiff's discharge was satisfied where plaintiff did not get along with at two employees and "[s]everal students with whom the plaintiff worked were dissatisfied with plaintiff's job performance . . . .") Defendant has met its burden.

### 4. Pretext

Because Defendant has offered a nondiscriminatory reason for terminating Plaintiff, the burden shifts to Plaintiff to show that Defendant's reason is pretextual. *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009) ("In light of [the] defendants' showing, the burden shifts back to plaintiff to establish . . . that defendants' proffered reasons are pretextual . . . .") To avoid summary judgment, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb*, 521 F.3d at 138 (quoting *Cronin*, 46 F.3d at 203); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013). A plaintiff "can demonstrate pretext with direct evidence . . . or with indirect or circumstantial evidence." *Bagley v. J.P. Morgan Chase & Co.,* No. 10-CV-1592, 2012 WL 2866266, at *12 (S.D.N.Y. July 12, 2012). For example, "[a] plaintiff may show pretext by illuminating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons." *Bagley*, 2012 WL 2866266, at *12 (internal quotation marks omitted) (quoting *Clarke*, 2011 WL 4356085, at *9); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). "A court may re-consider evidence presented to find an inference of discrimination at the prima facie stage." *Senese v. Longwood Cent. Sch. Dist.*, No. 15-CV-07234, 2018 WL 3716892, at *15 (E.D.N.Y. Aug. 3, 2018) (citing *Ingenito v. Riri USA, Inc.*, No. 11-CV-2569, 2013 WL 752201, at *12 (E.D.N.Y. Feb. 27, 2013)); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173 (2d Cir.

2006) (holding that a plaintiff may demonstrate pretext "either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more"); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("[T]he plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more.").

Plaintiff has satisfied his burden of demonstrating pretext with the evidence discussed above. The Catapano Email requesting Plaintiff's termination contains numerous complaints from Plaintiff's former colleagues and supervisors. However, the Catapano Email also lists complaints from Pollack. Because a triable issue of fact exists as to Pollack's motives for his complaints about Plaintiff, and there is no dispute that the Catapano Email led to Plaintiff's termination, Plaintiff has demonstrated that a reasonable jury could find that a discriminatory reason may be at least one of the motivating factors that led to his termination. *See Holcomb*, 521 F.3d at 138 ("[P]laintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating factors.'" (citing *Cronin*, 46 F.3d at 203)).

### 5. Faragher/Ellerth Affirmative Defense

Judge Tiscione found that the *Faragher/Ellerth* defense was not available to Defendant because (1) Plaintiff alleged a tangible employment action and there is a triable issue of fact as to whether it resulted in part from his rejection of Pollack's sexual harassment, and (2) Plaintiff's failure to take advantage of remedial measures may not have been unreasonable given the fact that Pollack's behavior only began a month before his termination. (R&R 25–26.)

Defendant argues that the "record does not support a finding that [P]laintiff's termination was a consequence of any harassment by Pollack," even if Pollack could be deemed Plaintiff's supervisor and his "conduct sufficed to constitute a cognizable hostile work environment." (Def. Obj. ¶ 19.) In addition, Defendant argues that Plaintiff failed to take reasonable steps to avoid the harm he alleges, therefore, there is no basis for the imposition of vicarious liability. (*Id*.)

Under *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), if a supervisor's harassment culminates in a tangible adverse employment action, the employer is strictly liable for that supervisor's harassment. *See Redd*, 678 F.3d at 182 ("If [a supervisor's] 'harassment culminate[d] in a tangible employment action, such as discharge, demotion, or undesirable reassignment,' the employer is held strictly liable, and '[n]o affirmative defense is available." (second and third alteration in original) (quoting *Ellerth,* 524 U.S. at 765, and citing *Faragher,* 524 U.S. at 808); *see also Vance*, 570 U.S. at 133. However, if the harassment does not result in any tangible employment action, or if "any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment," the employer may raise an affirmative defense. *Gorzynski*, 596 F.3d at 103 n.3; *see Redd*, 678 F.3d at 183 (acknowledging that "the employer may avoid liability by establishing [this] affirmative defense on which it has the burden of proof" but finding disputed issues of fact precluded summary judgment based on the defense).

To establish the *Faragher*/*Ellerth* affirmative defense, the employer must show "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 50 (2d Cir. 2012) (citing *Faragher*, 524

U.S. at 807; and then citing *Ellerth*, 524 U.S. at 765); *Redd*, 678 F.3d at 182 (same); *see also*

*Vance*, 570 U.S. at 133 (restating two prongs of *Faragher/Ellerth* defense). Although "[t]he

defendant bears the ultimate burden of persuasion on this [second] element, . . . it may carry that

burden by first introducing evidence that the plaintiff failed to avail herself of the defendant's

complaint procedure and then relying on the absence or inadequacy of the plaintiff's justification

for that failure." *Ferraro v. Kellwood Co*., 440 F.3d 96, 103 (2d Cir. 2006) (citing *Leopold v.*

*Baccarat, Inc*., 239 F.3d 243 at 246; *see Leopold*, 239 F.3d at 246 ("Once an employer has

satisfied its initial burden of demonstrating that an employee has completely failed to avail

herself of the complaint procedure, the burden of production shifts to the employee to come

forward with one or more reasons why the employee did not make use of the procedures."). The

*Faragher/Ellerth* defense is only available where no tangible employment action is taken as a

result of a supervisor's harassment.

Defendant argues that the *Faragher/Ellerth* affirmative defense defeats Plaintiff's action

because Plaintiff suffered no tangible adverse employment action due to Pollack's alleged

harassment. However, as discussed *supra*, there are genuine issues of material fact as to whether

Plaintiff was terminated in part as a result of his rejection of Pollack's alleged sexual advances

and whether Pollack's alleged conduct can be imputed to Defendant. Although Defendant might

persuade a jury that Plaintiff's termination was not a consequence of any harassment by Pollack

or that Pollack was not empowered by Defendant such that he can be deemed a supervisor, these

questions of fact cannot be decided on a motion for summary judgment. Defendant is therefore

not entitled to summary judgment based on this defense.[6] *See Redd,* 678 F.3d at 183 (finding

_____

[6] Defendant has not met its burden of establishing that there are no disputed issues of
fact as to whether Plaintiff suffered a tangible employment action as required by the

disputed issues of fact regarding the validity of *Faragher/Ellerth* defense precluded summary judgment).

**III. Conclusion**

For the foregoing reasons, the Court grants Defendant's motion for summary judgment as to Plaintiff's (1) Title VII disparate treatment gender discrimination claims, (2) Title VII and ADEA retaliation claims based on age and national origin, and (3) Title VII sexual harassment claim against Larsen. The Court denies Defendant's motion for summary judgment as to Plaintiff's sexual harassment claim against Pollack.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 30, 2018
        Brooklyn, New York

---

*Faragher/Ellerth* defense, therefore, the Court declines to determine whether Plaintiff failed to take advantage of any preventive or corrective opportunities at Bellevue. *See Burford v. McDonald's Corp.*, 321 F. Supp. 2d 358, 364 (D. Conn. 2004) ("[T]he affirmative defense is only available to [defendant] if plaintiff suffered no tangible employment action.")